**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JASON FETTER | Civil No.: 2:14-cv-02108 (KSH) |
| *Plaintiff,* | |
| v. | |
| MAERSK LINE, LIMITED and 3MC MOBILE & MECHANICAL REPAIR LLC | **OPINION** |
| *Defendants.* | |

### Katharine S. Hayden, U.S.D.J.

Before the Court are motions for summary judgment filed by co-defendants Maersk Line, Limited ("Maersk") and 3MC Mobile & Mechanical Repair LLC ("3MC"), seeking dismissal of plaintiff Jason Fetter's claims. For the reasons set forth below, Maersk's and 3MC's motions for summary judgment are granted. Because the Court dismisses all of Fetter's claims against defendants as a matter of law, 3MC's pending motions in limine to exclude expert testimony are denied as moot.

### I.    Procedural History

On June 11, 2013, Fetter filed this matter in Texas state court. The suit was subsequently removed to the Southern District of Texas and transferred to this Court. Fetter's amended complaint alleges he was injured as a result of Maersk and 3MC's

negligence (D.E. 28), and they filed crossclaims against each other for indemnity and contribution (D.E. 33, 34.)

On April 22, 2016, before discovery closed, Maersk moved for summary judgment, arguing that it is statutorily immune from liability. (D.E. 48, 58.) This Court denied the motion, finding that the record was insufficiently developed ("In short, the record is by no means definitive on the issue of Maersk's employer-employee relationship with Fetter, as it would need to be for a summary judgment ruling in Maersk's favor."). (D.E. 74.) Maersk unsuccessfully sought reconsideration. (D.E. 77.) After conducting further discovery, Maersk and 3MC filed these pending motions for summary judgment, which are fully briefed. (D.E. 111, 114-116, 118, 122-124.)

In this second round of dispositive motion practice, the parties' pending arguments can be summarized as follows. Maersk renews its legal argument that there is no genuine issue of material fact that it employed Fetter and thus had the ultimate right to control his performance, and as a result, is immunized from Fetter's negligence claims pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, which bars maritime employees from bringing tort actions against their employers.

3MC is moving for summary judgment for the first time. Preliminarily, 3MC adopts a position Maersk took in its first motion for summary judgment, that Fetter's role as a day engineer does not qualify him for seaman status under the Jones Act, 46 U.S.C. § 30104. Thereafter, 3MC joins the argument that Maersk employed Fetter.

Based largely on new evidence produced in discovery, 3MC argues that Maersk never relinquished its control of Fetter and that 3MC employee Greg Higgs was a "borrowed servant," and any authority Higgs exercised over Fetter came from Maersk. Based on Higgs's status, 3MC contends that it also is immunized from Fetter's negligence claims under the LHWCA because Higgs and Fetter were co-employees.

Fetter has submitted opposition briefs to these motions that are similar to each other as well as to his brief opposing Maersk's prior summary judgment motion. He primarily relies on materials previously reviewed by the Court to argue that Fetter was supervised almost exclusively by 3MC, which raises, he argues, material issues requiring a factfinder to determine whether Maersk employed Fetter at the time of his accident. In addition, Fetter asserts that the question of whether he qualifies as a Jones Act seaman is a fact question for the jury.

## II.    Factual Background

As set forth in the Court's 2016 opinion, this case concerns the cargo ship the M/V MAERSK MONTANA ("MAERSK MONTANA") and Jason Fetter, who worked on the ship on October 9, 2012, and was injured. The focus is Fetter's status—as a seaman, or not, and, relatedly, as an employee of Maersk, or not—at the time of his injury. The record facts pertinent to these issues are as follows.

Maersk had a collective bargaining agreement ("CBA") with a seafarer's union, the Marine Engineers Beneficial Association ("MEBA"), which allowed Maersk to hire temporary "day engineers" to perform necessary repairs and maintenance when

ships were called to port.  (D.E. 114-11 ("Maersk SOF") ¶ 2.)  Per the CBA, MEBA

bills Maersk for these day engineers' wages, and Maersk pays the wages directly to

MEBA.  (*Id.*)  MEBA then deducts taxes and union fees from the wages and remits

the remainder to the day engineers.  (*Id.*)  If several maintenance projects are going on

at once, Maersk will also hire an outside vendor to supervise the day engineers' work.

(D.E. 114-6 ("Mark Anderson Affidavit") ¶ 7.)

Maersk owns and operates the MAERSK MONTANA.  (D.E. 111-1 ("3MC

SOF") ¶ 3.)  On October 4, 2012, the ship's captain requested five MEBA day engineers

to perform repair and maintenance tasks aboard the vessel while it was called to port in

Newark, New Jersey on October 9, 2012.    (D.E. 111-12 ("Maersk-MEBA Work

Request Email").)  Maersk also requested that its vendor, 3MC, through its employee

Greg Higgs, supervise the day engineers performing the tasks.  (D.E. 111-5 ("3MC-

Maersk Purchase Order").)

Fetter joined MEBA in October 2010.  (D.E. 111-6 ("Fetter Deposition"), at

16:21-23.)  On October 8, 2012, while in between jobs, Fetter bid on and received the

October 9, 2012 day engineer job aboard the MAERSK MONTANA.  (Maersk SOF ¶

12.)  Fetter understood he was hired to work for only one day and would not sail with

the ship.  (*Id.* ¶ 13.)  Fetter did not sign seaman's articles with Maersk.[1]  (Maersk SOF

¶16.)

---

[1] Shipping articles are an agreement between an employer-shipowner and a crewmember.  These
contracts address various terms, including the voyages to be undertaken, the seaman's position,

On October 9, 2012, Fetter and four other day engineers reported to the MAERSK MONTANA to perform various maintenance and repair projects in the ship's main engine room. (*See* Mark Anderson Affidavit ¶ 5.) After they boarded the ship, the MAERSK MONTANA's first assistant engineer, David Peterson, told 3MC engineer Greg Higgs and the day engineers about the tasks to be completed that day, showed them where tools were located, and ran through Maersk's procedures. (3MC SOF ¶ 16.) Thereafter, Higgs tasked Fetter and two of his colleagues with removing a stuck injector in the ship's main engine. (Mark Anderson Affidavit ¶ 6; *see also* D.E. 115-5 ("Christopher Zimmerman Report").) After Higgs suggested to Fetter and his colleagues how to complete the task, he left them to do the work and he went to another part of the ship to repair the auto start valve. (D.E. 111-11 ("Higgs Affidavit") ¶¶ 21-22.) While Fetter was attempting to remove the stuck injector, he was injured. (Fetter Deposition, at 73-74.) Higgs learned of Fetter's injury a few hours later. (Higgs Affidavit, ¶ 2.)

## III. Discussion

### A. Statutory Framework

As discussed in this Court's December 2016 opinion, the LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen

---

amount of wages, and a crewman's term of service. 70 Am. Jur. 2d Shipping § 238. The parties refer to "seaman's articles," which are likely synonymous with shipping articles.

and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 96 (1994). "As with most other workers' compensation schemes, this entitlement displaces the employee's common-law right to bring an action in tort against his or her employer . . . [and] limits employer liability to the provision of scheduled no-fault compensation payments." *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 62 (2d Cir. 2002); *see also* 33 U.S.C. §§ 904, 905(a). This compensation scheme creates a quid pro quo; "[e]mployers relinquish[] their defenses to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail." *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 951 (3d Cir. 1990) (citing *Morrison-Knudsen Construction Co. v. Director, OWCP*, 461 U.S. 624, 636 (1983)).

Employees eligible for LHWCA benefits include "any person engaged in maritime employment, including . . . a ship repairman." 33 U.S.C. § 902(4). While in certain instances an employee may bring a negligence action against his employer in his capacity as a vessel owner, this is not true when the employee is engaged in "repairing…services." [2] 33 U.S.C. § 905(b). Furthermore, the LHWCA expressly

---

[2] Neither the Supreme Court nor the Third Circuit has defined "repairing," but other Circuits offer guidance. The Fifth Circuit held that "repair" is to be given its ordinary meaning and thus entails "restor[ing] a vessel to a sound or healthy state." *New v. Associated Painting Services, Inc.,* 863 F.2d 1205, 1210 (5th Cir.1989). Maintenance work involves "preserv[ing] the vessel's current condition." *Id.*

excludes from coverage "a master or member of a crew of any vessel." 33 U.S.C. §
902(3)(G).

While the LHWCA bars maritime workers from suing their employers for
injuries incurred on the job, "seamen" can bring such actions under the Jones Act. *See
O'Hara*, 294 F.3d at 62. "The LHWCA and the Jones Act complement one another."
*Id.* Specifically, the "master[s] or member[s] of a crew" who are expressly excluded
from the LHWCA's no-fault compensation regime are the "seamen" who are entitled
to sue their employers for damages under the Jones Act. *See Harbor Tug and Barge Co. v.
Papai*, 520 U.S. 548, 553 (1997). Thus, "[t]he Jones Act allows seamen to recover for
negligence against their employers; the LHWCA authorizes maritime workers *other than*
seamen to recover for negligence, but only against parties *other than* their employers."
*O'Hara*, 294 F.3d at 62 (citing *Chandris, Inc. v. Lastis*, 515 U.S. 347, 355–56 (1995)
(emphasis in original)).

### B. Standard of Review

Summary judgment is warranted when the moving party demonstrates that
"there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). An issue of
fact is material and genuine if it "affects the outcome of the suit under the governing
law and could lead a reasonable jury to return a verdict in favor of the nonmoving
party." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)
(quotation and alteration marks omitted). The party seeking summary judgment has
"the burden of demonstrating that the evidentiary record presents no genuine issue of

material fact." *Id.* And the Court must "view the evidence in the light most favorable to [the nonmoving party] and draw all justifiable, reasonable inferences in [his] favor." *Sgro v. Bloomberg L.P.*, 331 F. Appx. 932, 937 (3d Cir. 2009) (citation omitted). A mere "scintilla" of favorable evidence does not create a genuine dispute; there must be "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 252 (1986).

### C. The Employment Relationship

For Maersk to receive immunity under the LWCHA, it must have been Fetter's employer at the time of the injury. *See Darr v. Chevron U.S.A., Jr.*, 1997 WL 470153, at *4 (E.D. La. Aug. 12, 1997), *aff'd sub nom. Darr v. Chevron, U.S.A., Inc.*, 141 F.3d 1163 (5th Cir. 1998) ("Under the LHWCA, an employer is immune from tort liability only if the plaintiff is the employer's employee"). This concept of employer includes "borrowing employers" under the borrowed servant doctrine. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 940 (3d Cir. 1990).

The existence of an employer-employee relationship is a mixed question of law and fact. *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993). Nevertheless, "summary judgment…is mandated where the facts and the law reasonably support only one conclusion." *Harbor Tug*, 520 U.S. at 554 (internal citations omitted). When considering factual issues related to employment status, the "critical inquiry turns on the degree of control" that is exercised over the individual. *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 236 (3d Cir. 1991). Factors indicating control

include payment, direction, supervision, and the power to hire and fire. *Id.* The Third Circuit directs district courts to "apply ordinary principles of the law of agency adjusted by an eye on the peculiarities of maritime life" in making factual determinations. *Evans*, 4 F.3d at 216.

As noted above, the Court earlier denied summary judgment on its finding that the record was "by no means definitive on the issue of Maersk's employer-employee relationship with Fetter." (D.E. 74, at 6.)

> [T]he facts Maersk relies on, including how Fetter came to get the job, and which entity was paying him, must be evaluated alongside other evidence showing that when Fetter arrived at the ship, he reported to 3MC employee Higgs, who directed him to remove the stuck injector, and whose job it was to supervise him in the completion of the task that ultimately resulted in his injury.

> (*Id.*) Since then, the record has been supplemented by additional discovery that

more clearly defines the employer/employee relationship between Fetter and Maersk. Based largely upon additional evidence advanced by 3MC, the Court finds that the record on this second round of dispositive motion practice establishes that Maersk retained overall control of the ship, the engine room, and Fetter himself. As will be discussed in further detail below, factors indicating control include payment, direction, supervision, and the power to hire and fire. *Matute*, 931 F.2d at 236.

### D. Fetter was an employee of Maersk at the time of his injury

3MC argues that 3MC and Higgs "were at most, acting as Maersk's agents" aboard the MAERSK MONTANA and therefore, despite Higgs's role as a supervisor,

Maersk retained ultimate control over Fetter.  (D.E. 111-2 ("3MC's Moving Brief"), at pg. 11.)  To support this point, 3MC cites to examples of Maersk's general operations and practices as well as specific instances of Maersk exercising direct control over Fetter's working conditions.  To determine whether Maersk was Fetter's employer at the time of his injury, the Court will evaluate the "degree of control" Maersk exercised over him.  *Matute*, 931 F.2d at 236.  Specifically, the Court will examine how Fetter was paid, who had the power to hire and fire him, and who directed and supervised his work.  *Id.*

### Power to hire and fire

Fetter contends that Maersk's power to hire and fire is more limited with respect to day engineers than regular employees.  In support, he cites to deposition testimony explaining how the bid system works.  Maersk puts out a bid for a day laborer position and whoever wins that bid gets the job.  (D.E. 111-9 ("Mark Anderson Video Deposition"), at 124:2-4; 153:19-154:6.)  While Maersk cannot request a particular individual, or specify day engineers based on their seniority level (i.e., chief engineer status), a Maersk representative can still call or email MEBA and describe what skills are necessary to perform a specific task.  (Mark Anderson Video Deposition, at 122:23-123:4; D.E. 111-10 ("Christopher Zimmerman Video Deposition"), at 115:14-22.)  Nevertheless, that Maersk relies on a bid system with MEBA to hire its day laborers does not change the fact that it hired Fetter and his co-workers to work for it.  Moreover, this arrangement was a provision of the CBA

entered into between Maersk and MEBA, which further indicates that Maersk intended to create employment relationships with union members like Fetter. Clearly, MEBA was not Fetter's employer and 3MC had nothing to do with the arrangement between MEBA and Maersk. Moreover, only Maersk—not Higgs—had the ability to fire Fetter. (Higgs Affidavit ¶ 27.) If any issues arose, the chain of command required that Higgs first express his concerns to the first assistant engineer, David Peterson, who would then determine how to handle the situation. (*Id.*)

### Payment

It is undisputed that Maersk and MEBA had an arrangement whereby Maersk paid MEBA directly. It is also undisputed that after deducting certain fees and taxes, MEBA remitted the remaining amount to the day engineers. (Maersk SOF ¶ 2.) Maersk approved Fetter's final time sheet and paid his gross wages. (Fetter Deposition, at 33:23-34:6; Mark Anderson Affidavit ¶ 4.) The distinction between how Maersk paid temporary day laborers (through their union) and full-time employees does not change the fact that Maersk paid Fetter, and the record establishes that 3MC in no way contributed to Fetter's wages.

### Direction and Supervision

Fetter argues that he "was supervised almost exclusively by 3MC." (D.E. 115 ("Fetter's Opposition Brief – 3MC"), at 6-7.) He asserts that his and vessel superintendent Mark Anderson's testimony, and chief mate Christopher Zimmerman's investigative report, "all show that 3MC was controlling, directing, and supervising the

work." (*Id.* at 13.)  For instance, Zimmerman's report states that Fetter came aboard the ship to work as a technician for 3MC and was assigned the job of pulling out the stuck injector by Greg Higgs.  (Christopher Zimmerman Report.)  Anderson's deposition reflects that the personal injury report Maersk prepared lists Higgs, rather than chief engineer Bradley Ducharme or any other Maersk employee, as Fetter's supervisor.  (Mark Anderson Video Deposition, at 73:25-74:21.)  Fetter also cites to Anderson's testimony that Higgs assigned the job of pulling the stuck injector to Fetter. (*Id.* at 81:25-82:10.)  Additionally, Fetter cites to his own testimony where he states that an outside vendor was "directing the repairs" and that Higgs was "the boss."  (*See, e.g.,* Fetter Deposition, at 39:7-10; 79:24-80:4.)  As a result, Fetter contends that there are still "[i]ssues of fact . . . as to whether Plaintiff was employed by Maersk for purposes of the LHWCA."  (*Id.*)

Higgs did exercise some control over Fetter.  Maersk hired 3MC, and more specifically, Higgs, to supervise the day engineers' work aboard the MAERSK MONTANA.  (3MC-Maersk Purchase Order.)  And it was Higgs who assigned Fetter to the task of removing the stuck injector. (Mark Anderson Affidavit ¶ 6.)  But the record amply demonstrates that Maersk exercised ultimate control over the engine room, over what tasks had to be completed, and over the individuals there.

It was Maersk, not Higgs, who scheduled the repair and maintenance of the engine room and determined the tasks to be completed that day.  (Mark Anderson Video Deposition, 43:6-11; 140:2-14; Maersk-MEBA Work Request Email.)  Based on

its maintenance schedule, Maersk requested and planned for Fetter and four other day engineers to work on October 9, 2012 evidenced by the purchase order, which outlines the specific projects Maersk assigned to be completed and supervised by Higgs. (3MC-Maersk Purchase Order; *see also* Mark Anderson Video Deposition, 43:6-11, 140:2-14.) In addition, Fetter and the other day engineers used the tools provided by the ship on the day of the accident. (D.E. 111-8 ("David Peterson Deposition"), at 38:4-13; 55:15-24.) When asked who was in charge of the repairs, Fetter himself testified that Higgs was directing the repairs but that the "ship's crew had to have known about the repairs. They had to have called [Higgs], so I can't really answer who was directly [in charge.]" (Fetter Deposition, at 79:4-80:6.) When Higgs assigned Fetter to a task and advised him on how to complete it, he was following through with orders that came directly from Maersk.

The record also shows that Higgs had only limited authority within the engine room. The MAERSK MONTANA's first assistant engineer, David Peterson, testified that he was in charge of the engine room on the day of the accident and that the chief engineer was ultimately in charge "as far as the shipboard capacity." (David Peterson Deposition, at 55:8-14.) Vessel superintendent Mark Anderson testified that he holds the chief engineer responsible because "3MC is ultimately working for him. . . Ultimately, everyone works for the chief engineer in that engine room." (Mark Anderson Video Deposition, at 70:13-20; 71:13-22.) There is no evidence before the Court to establish that Higgs had authority beyond what the purchase order delineated.

As such, the conclusion must be drawn that he supervised in coordination and cooperation with Maersk, and Maersk employees, Peterson and Ducharme, ultimately were Higgs's supervisors. For example, when diagnosing an issue with the auto start valve, which was the more complicated of the two tasks he was assigned, Higgs went to Peterson for advice and got his consent before beginning his work. (Higgs Affidavit ¶ 23.) Higgs further stated that his role aboard the ship was to "ensure, with the assistance of the five (5) MEBA day engineers, the requested maintenance tasks were completed properly, efficiently, and effectively." He further explained that on all vessels he has sailed on, "[t]he Chief Engineer is the individual ultimately responsible for managing the engine room including anything that goes wrong in the engine room." (*Id.* ¶¶ 4, 12.)

While Fetter relies on the statement in Zimmerman's report that Fetter was hired to work for Higgs and Higgs was the one who assigned Fetter his task, Zimmerman also reported that Fetter and his colleagues asked Peterson where materials were stored before they began working. (Christopher Zimmerman Report, at 1-2.) And after Fetter was injured, the incident was immediately reported to Peterson, who called for Zimmerman and Maersk's medical officer. Thereafter, Zimmerman called the ship's captain, who summoned an ambulance. (*Id.*) Higgs, on the other hand, did not learn of Fetter's injury until several hours later; at no point while working on his other project did anyone inform him that Fetter was injured or that there was a problem with the engine repairs. (Higgs Affidavit ¶¶ 24-25.)

Maersk points out that Fetter and the other day engineers did not acquiesce to 3MC's employment. Maersk identifies 3MC as a vendor and acknowledges that Higgs supervised the day engineers, but further contends that it was chief engineer Ducharme who had the "ultimate supervisory responsibility" of the engine room on the day of the accident. (D.E. 114-10 ("Maersk Moving Brief"), at 2.) To support this claim, Maersk relies on Ducharme's deposition testimony and that of Fetter's fellow day engineer, Donald Patina.

According to Patina, he was not aware of 3MC's or Higgs's existence and did not know that Maersk had hired a vendor to supervise the day engineers' work. (*Id.* at 5-6.) Fetter's opposition cites to places in Patina's deposition where he was unable to recall important details about the incident (i.e., Patina could not remember meeting with the chief engineer on the day of the accident, the steps taken to remove the injector, or who assigned him his task that day). (D.E. 116 ("Fetter's Opposition Brief – Maersk"), at 4-5.; D.E. 116-10 ("Patina Deposition"), at 18:11-17; 19:17-23; 26:4-11; 29: 21-24; 31:18-23.) Notwithstanding, Patina's testimony coincides with Fetter's; while Fetter understood that a vendor supervised his work on the day of the injury, he testified that he did not know 3MC was the vendor. Fetter was unable to recall the name of the outside company supervising the day engineers on the day of the accident (3MC), nor could he recall the name of his specific supervisor (Higgs). (Fetter Deposition, at 23:7-23; 44:18-24.) When asked directly if he knew who Higgs was, Fetter said that the name "rings a bell, but I can't say whether it was him [who was my supervisor] or not." (*Id.*

at 44:18-24.) The Court is satisfied that the record evidence is sufficient to establish that the day engineers did not consent to employment by 3MC.

As to legal consequences of Higgs's relationship with the day engineers, Maersk points to Ducharme's deposition, in which he describes Higgs as an expert in working on Sulzer flex type engines. (D.E. 116-11 ("Bradley Ducharme Deposition"), at 62.) Maersk explains that 3MC was hired more as a consultant—to "monitor the performance of the day engineers." (Maersk's Moving Brief, at 6-7.) In opposition, Fetter cites to a different portion of Ducharme's testimony where he says that 3MC was hired as a supervisor. (Fetter's Opposition Brief –Maersk, at 5; Bradley Ducharme Deposition, at 85:18-23; 3MC-Maersk Purchase Order.) The Court is unpersuaded that Ducharme's terminology changes what the record consistently establishes: Maersk hired 3MC and Higgs to give direction to the day engineers hired by Maersk, and arguing over classification terminology does not shed light on whether Maersk relinquished its control of Fetter to 3MC such that 3MC displaced Maersk as Fetter's employer.

Instead, the record sufficiently supports a finding that Maersk exercised overall control of the work it had planned for that day and whatever supervision Higgs had over the day engineers did not affect that control. Where Fetter maintains in his brief that "there are obvious issues of fact as to whether Maersk controlled or supervised the work" (Fetter's Opposition Brief –3MC, at 6), and, by extension cast doubt about his employment at the time of his injury, he is offering only a conclusory argument.

The Court has carefully examined what Fetter offers as support for his opposition to summary judgment on the issue of who employed him.  It is satisfied that on this record, he has not created a genuine dispute of fact about what the evidence establishes:  Maersk, and not 3MC, served as Fetter's employer.

### Evidence of Fetter's status as a vendor

Fetter argues there is nonetheless a material factual issue about the nature of his employment on the day of the accident that arises from Maersk's personal injury report (D.E. 114-5 ("Maersk Personal Injury Report"), where he is referred to as a vendor. Fetter also cites to the portion of Mark Anderson's deposition testimony where he reviews this report (Mark Anderson Video Deposition, at 156:7-157:3).  Based on this, Fetter argues that Maersk classified him as a vendor, and because vendors are not considered employees under the LHWCA, an issue of fact exists as to whether Maersk employed him.  (Fetter's Opposition Brief – 3MC, at 6-7.)

With respect to the personal injury report, Anderson testified that he did not understand why Fetter was listed as a vendor and that he "was absolutely an employee of Maersk Line."  (Mark Anderson Video Deposition, at 157:3-158:20.)  Additionally, Zimmerman, who filled out the personal injury report before investigating the incident, testified that he did not know what Fetter's role was at the time he wrote the report.  (Christopher Zimmerman Video Deposition, at 68:12-24; 132:21-23.)  Moreover, as established by the record evidence, the control that an employer exercises over an individual is what indicates an employment relationship; how Fetter was labeled on an

injury report is thus immaterial. (*See* supra Part III (C-D).) And while individuals employed by vendors may not be considered employees under the LHWCA, those that perform work normally performed by LHWCA employees, such as Fetter, are in fact covered by the act. 33 U.S.C. §902(3)(D). ("The term 'employee' means any person engaged in maritime employment…but such term does not include…(D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this chapter.") Thus, an individual working for a vendor may still be covered by the Act if he performs tasks routinely engaged in by maritime employees. Based on the record and the law, Fetter's "vendor" argument fails.

### E. Higgs was a borrowed servant of Maersk

Having found that the record shows Maersk was Fetter's employer, the Court turns to 3MC's argument that it deserves summary judgment because Higgs, its employee, was a borrowed employee of Maersk at the time of Fetter's accident. The question of whether an individual is a borrowed employee relationship exists is generally a matter of law.

An individual may be in the "general employ of one company while at the same time being in the particular employ of another 'with all the legal consequences of the new relation.'" *White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000) (quoting *Standard Oil Co. v. Anderson,* 212 U.S. 215, 220 (1909)). The "authority of the borrowing

employer does not have to extend to every incident of an employer-employee relationship; rather, it need only encompass the servant's performance of the particular work in which he is engaged at the time of the accident." *White*, 222 F.3d at 149. Several Circuits, including the Third, have applied the borrowed servant doctrine to determine which of two possible employers should be designated as the employer under the LHWCA. *See Peter v. Hess Oil Virgin Islands Corp*, 903 F.2d 935 (3d Cir. 1990). The Fifth Circuit developed a nine-factor test to assess the claims of borrowed employment.[3] In *Peter*, the Third Circuit referenced this approach, and indicated that two comprehensive questions are crucially important in the workers' compensation context: "(1) whether the borrowing employer was responsible for the borrow[ed] employee's working conditions and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment. *Peter*, 903 F.2d at 942 (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir. 1977), *cert. denied*, 436 U.S. 913 (1978)).

---

[3] The nine factors are:
(1) Who has control over the employee and his work? (2) Whose work is being performed? (3) Was there an agreement between the original and borrowing employer? (4) Did the employee acquiesce in the new work situation? (5) Did the original employer terminate his relationship with the employee? (6) Who furnished the tools and place for performance? (7) Was the new employment over a considerable length of time? (8) Who has the right to discharge the employee? (9) Who had the obligation to pay the employee.
*Peter*, 903 F.2d at 942, fn.7(citing *West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985)).

*Responsibility for working conditions*

3MC contends that the MAERSK MONTANA crew "exercised complete dominion and control over Higgs" because they 1) retained ultimate control over the engine room and 2) the first assistant engineer reviewed and approved Higgs's more complicated repair tasks. (3MC's Moving Brief, at 14.) Fetter argues that the borrowed servant analysis is unnecessary and should not affect his claims. (Fetter's Opposition Brief - 3MC, at pg. 16.)[4]

The record evidence establishes that Maersk exercised control over Higgs and his work. From the start, it was clear from 3MC's and Maersk's contractual agreement that Higgs was to follow Maersk's instructions. The purchase order outlined the specific tasks to be completed aboard the vessel. (3MC-Maersk Purchase Order.) Additionally, when Higgs arrived at the ship, he first spoke with Maersk's first assistant engineer. (Higgs Affidavit ¶ 18.) Of the two tasks Higgs was ordered to supervise and complete, he delegated the simpler one to Fetter and two other day engineers and kept the more complex auto valve task. And even after he diagnosed the issue with the auto valve, Higgs went to Maersk's first assistant engineer and asked for approval and permission to proceed. (*Id.* ¶ 23.)

---

[4] Fetter relies on an Eleventh Circuit case, which held that "when [applying] the [borrowed servant] doctrine to cases arising under the LHWCA…our focus is more limited than at common law." *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1123-24 (11th Cir. 2011). The *Langfitt* court reasoned that the borrowed servant doctrine should apply "in the LHWCA context only to assess whether an employee covered under the Act, and injured in the course of employment, was a borrowed servant at the time of injury." *Id.* The Court is not persuaded by this analysis and will not limit the doctrine in this way.

Additionally, Maersk furnished tools for Higgs to use while completing repairs. (David Peterson Deposition, 55:15-24.) According to Higgs, "[w]hen working with MEBA day engineers, my main task was ensuring the required maintenance was properly completed. The chief engineer or first assistant engineer always directed myself and the MEBA day engineers to the required maintenance tasks which needed completion…at all relevant times on board the MAERSK MONTANA…the First Assistant Engineer oversaw and directed myself and the five MEBA day engineers." (Higgs Affidavit ¶¶ 8,19.) The Court is satisfied that there is substantial evidence to support a finding that Maersk controlled Higgs's work aboard the MAERSK MONTANA and was therefore responsible for his working conditions on the day of the accident. More to the point given Fetter's stance on these motions, the record does not reflect a quantum of evidence sufficient to create a material issue of fact on this point.

### Acquiesced to risks of new employment

3MC argues that Higgs acquiesced to the risks of his new employment based on his prior experience working in the engine rooms of large commercial vessels. This factor focuses on whether "an employee was aware of the working conditions of the new employment and chose to continue working under those conditions without complaint." *Guillory v. Gukutu*, 534 F. Supp.2d 267, 272 (D.R.I 2008) (citing *Melancon v. Amoco Prod. Co.*, 834 F.2d, 1238, 1246 (5th Cir. 1988)). Higgs was only hired to work for one day aboard the MAERSK MONTANA, but he testified that he "knew,

understood, and appreciated all the risks of working" on the ship's engine, and "quickly felt at home, knowing and appreciating these risks because [of his] extensive work experience with these engines and a career spent in container ship engine rooms." (Higgs Affidavit ¶ 17.) Higgs explained that one of his main responsibilities at 3MC was "assist[ing], supervis[ing], and plan[ning] main engine maintenance alongside MEBA day engineers hired by the vessel's owner or operator." (*Id.* ¶ 7.) Higgs was familiar with the role he played in this arrangement and had worked in this capacity before. (*Id.*) Therefore, the record evidence establishes that Higgs understood and accepted the risks of his new employment as required to establish that he was a borrowed servant of Maersk.

From the foregoing, the Court is satisfied that Higgs was indeed a borrowed servant of Maersk at the time of Fetter's accident, which not only supports the conclusion that 3MC is immunized from Fetter's negligence claims pursuant to the LHWCA, but also forecloses Fetter's argument that Higgs's supervision of Fetter created an employment relationship between 3MC and Fetter.

### F. Higgs was in the same employ as Fetter

Section 933(i) of the LHWCA bars the claims of injured maritime workers against co-employees, stating that the "right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured…by the negligence or wrong of any other person or persons in the same employ." 33 U.S.C. § 933(i). As a borrowed servant, Higgs and Fetter were both in the "same employ" of

Maersk. *Guillory v. Gukutu*, 534 F.Supp.2d 267, 274 (D.R.I. 2008); *Perron v. Bell Maintenance & Fabricators*, 970 F.2d 1409, 1411 (5th Cir. 1992) *cert. denied*, 113 S. Ct. 1264 (1993). Section 933(i) also bars a maritime worker's negligence claim against a borrowed servant's employer by way of *respondeat superior. See Perron*, 970 F.2d at 1413; *Guillory*, 534 F.Supp.2d at 275. The record evidence demonstrates that Fetter, as a day laborer, and Higgs, as a borrowed servant supervising the day laborers, were both in Maersk's employ on the day of the accident to perform repairs to the ship's engine. Thus, 3MC is immunized from Fetter's negligence claims pursuant to the LHWCA.

### G. Is Fetter covered under the Jones Act

Albeit the Court is satisfied that Fetter was Maersk's and not 3MC's maritime employee, the issue remains whether Maersk employed him as a seaman, entitling him to the benefits of the Jones Act, which provides a remedy to "any seamen who shall suffer personal injury in the course of his employment." 46 U.S.C.A. § 30104.

Preliminarily, Fetter correctly states that the question of whether an individual is a seaman is generally submitted to a jury. *Papai*, 520 U.S. at 554. This inquiry is fact-specific and "will depend on the nature of the vessel and the employee's precise relation to it." *Chandris, Inc. v. Latsis* 515 U.S. 347, 371 (1995) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355 (1991)). However, "where undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury" and grant summary judgment. *Id.* The

Court is satisfied that the factual record on these motions is more than sufficient to draw a legal conclusion that Fetter was not a Jones Act seaman at the time of the injury.

Congress enacted the Jones Act to ensure that seamen receive heightened legal protections given their "exposure to the perils of the sea." *Id.* at 354. With this purpose in mind, the Supreme Court in *Chandris* articulated a two-prong standard to determine who qualifies as a Jones Act seaman. First, the individual's duties "must contribute to the function of the vessel or the accomplishment of its mission." *Id.* at 368. Second, the individual must have a connection to a vessel or group of vessels "in navigation" that is "substantial in terms of both its duration and nature." *Id.*

3MC does not contest the first prong, which considers whether Fetter's work contributed to the MAERSK MONTANA's function and mission. Satisfying this requirement is not difficult; it encompasses "all who work at sea in the service of the ship." *Id.* Thus, the "claimant need only show that he does the ship's work." *Becker v. Tidewater, Inc.* 335 F.3d 376, 388 (5th Cir. 2003), *as revised* (July 24, 2003) (citing *Chandris*, 515 U.S. at 368). Although it is undisputed that Fetter was tasked with repairing the MAERSK MONTANA's engine, it is not clear that his work as a temporary day laborer aboard a docked ship satisfies the requirement that he "work at sea." *See Heise v. Fishing Co. of Alaska,* 79 F.3d 903, 906–907 (9th Cir. 1996) (concluding that temporary laborer who was only aboard the vessel for duration of repairs and maintenance was land-based, and thus did not work at sea.)

Nevertheless, as 3MC correctly argues, Fetter's claim falters at the second step of the analysis. Although it is undisputed that the MAERSK MONTANA is a vessel, no reasonable jury could find that Fetter had a connection to it that was substantial in both duration and nature.

This second requirement exists "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Chandris*, 515 U.S. at 388. Courts should consider the totality of the employee's employment when determining if he has a "sufficient relation to the navigation of the vessels and the perils attendant thereon…the ultimate inquiry is whether the worker…is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time." *Id.* at 370. Notably this second prong is a "status-based" standard, meaning that the employee's job is not determinative of his seaman status; rather, the focus is on his connection to the vessel. *Id.* at 364.

Fetter fails the functional component of this second prong because his work on the ship "did not regularly expose him to the special hazards and disadvantages of the sea." *See Matter of Buchanan Marine, L.P.*, 874 F.3d 356, 366 (2d Cir. 2017), *cert. denied sub nom. Volk v. Franz*, 138 S. Ct. 1442, 200 L. Ed. 2d 718 (2018); *see also Casser v. McAllister Towing & Transp. Co.*, 2010 WL 5065424, at *3 (S.D.N.Y. Dec. 7, 2010) (holding that employee failed to satisfy functional component of the second *Chandris* prong because "[p]erforming repairs and conducting inspections on [docked vessels] hardly exposes

the plaintiff to 'the perils of the sea.'"); *Harbor Tug & Barge Co.*, 520 U.S. at 555 ("For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea."). Fetter's connection to the vessel is limited "to the time that the vessel was…undergoing maintenance and repairs." *See Heise v. Fishing Co. of Alaska, Inc.* 79 F.3d 903, 906 (9th Cir. 1996) (finding that temporary repair and maintenance worker who did not sign ship's articles and did not sail with vessel was not a seaman).

The MAERSK MONTANA was at port in Newark on the day of the accident. (3MC SOF ¶ 6.) Fetter was not scheduled to go to sea, nor was he hired to sail aboard the ship when it got underway. (114-3 ("Fetter's Response to First Request for Admissions."), at 3-4.) He was hired to perform the discrete task of engine repair alongside other day laborers. Fetter did not encounter the same hazards as the ship's crew, nor was he ever far from shore-based assistance. To argue that Fetter is subject to the perils of the sea by simply boarding a stationary ship, would effectively eliminate the distinction between seaman and other maritime employees, a "conclusion that cannot stand in light of the two separate and mutually exclusive compensation schemes Congress established." *Casser*, WL5065424, at *3.

Moreover, Fetter fails the temporal component of the *Chandris* test. As a MEBA day engineer, Fetter was hired for one day, and not as a permanent member of the ship's crew. (Fetter Deposition, at 22:11-18.) Fetter had worked as a day laborer for a different company previously and was therefore familiar with the short-term nature of

this work. (Fetter Deposition, at 18: 2:10.)  Furthermore, Fetter did not sign articles. (Maersk SOF ¶16.)

Although a one-day assignment seems insubstantial, the "durational element cannot be answered by an absolute measure. . . the contemplated number of days of employment is only one [factor]" in this analysis.  *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 259-260 (3d Cir. 1998) (finding that a ten-day period was not an inadequate temporal connection where plaintiff was expected to perform normal crew service). "[L]ack of long attachment to a vessel cannot deny seaman status as a matter of law." *Id.* 259-260.  Instead, the Court must weigh the time that Fetter worked aboard the ship alongside the nature of his work.  The Court has already noted the insubstantial nature of Fetter's connection to the vessel.  Thus, a temporary, one-day position does not counter-balance the insubstantial nature of performing discrete repair tasks aboard a docked ship.  No reasonable jury could conclude that, weighing the totality of the circumstances, Fetter demonstrated a connection to the MAERSK MONTANA that was substantial in both duration and nature.

Fetter focuses most of his argument on the proposition that the determination of seaman status is a fact question that should be submitted to a jury.  The only piece of evidence Fetter advances to dismantle 3MC's claim that Fetter is not a seaman is that Maersk paid Fetter maintenance and cure.[5]  Employers pay maintenance and cure to

---

[5] "Maintenance" is a living allowance provided to pay a worker's daily expenses, such as food and shelter, while he is injured or recuperating.  Kimbley A. Kearney & Mark J. Sobczak, *Ancient Duties,*

their seamen employees.  *See Delaware River & Bay Auth. V. Kopacz*, 584 F.3d 622, 632

(3d Cir. 2009).  Workers' compensation, on the other hand, is a benefit paid under the

LHWCA compensation scheme.  Fetter points to his deposition to prove that he

received maintenance, rather than workers' compensation.  (Fetter Deposition, at

98:16-99:5 ("I was paid a maintenance fee after my accident.").)  However, Fetter fails

to include the remaining portion of this testimony, in which he explains that Maersk

also attempted to pay him a form of workers' compensation:

> Q: Did they ever make a lump-sum payment to you?
> A: I received a check, but I didn't know where it was from, and I never cashed
> it…
> Q: Is it your understanding that they were trying to pay you under the
> Longshore and Harbor Workers' Compensation Act?
> A: I believe that's what I was being paid under.

*(Id.* at 99:6-17.)

It is undisputed that Maersk attempted to pay Fetter after his accident.  The

evidence Fetter presents, about how this payment was labeled, distracts from the real

issue: whether Fetter's role as a day engineer who was hired to perform repairs aboard

a docked ship creates a substantial connection to the MAERSK MONTANA in

duration and nature.  The record evidence does not demonstrate any dispute of

---

*Modern Perspectives: Recent Developments in the Law of Maintenance and Cure*, 89 Tul. L. Rev. 1135, 1168
(2015).  "Cure" is used to pay for reasonable medical care, including hospital bills and rehabilitation
services.  *Id.*  These are both short-term benefits; they are only provided until the patient has reached
"maximum medical improvement." *Id.*  Nevertheless, this is a more expansive remedy than workers'
compensation provides.  *Messier v. Bouchard Transp.*, 688 F.3d 78, 81-82 (2d Cir. 2012).

material fact as to this question, and accordingly, the Court concludes that no reasonable jury could find that Fetter qualified as a Jones Act seaman.

### H. Fetter is precluded from bringing a claim under 33 U.S.C. § 905(b)

Although the LHWCA immunizes maritime employers from negligence claims brought by their maritime employees, the statute permits an injured maritime worker to bring a negligence claim against his employer in its capacity as a vessel owner. 33 U.S.C. § 905(b). However, there is a significant carve out in this provision; §905(b) explicitly precludes maritime worker engaged in "shipbuilding, repairing, or breaking services" from bringing a claim against the employer-vessel owner. *Id.* The record evidence plainly demonstrates that Fetter was Maersk's employee and that Fetter was engaged in ship repair at the time of the accident. Therefore, summary judgment is also proper as to claims Fetter has asserted under section 905(b). *See e.g. Johnson* v. *Continental Grain Co.,* 58 F.3d 1232 (8th Cir.1995); *Easley* v. *Southern Shipbuilding Corp.,* 965 F.2d 1 (5th Cir. 1992).

### IV.   Conclusion

The Court has thoroughly reviewed the record and examined the movants' legal arguments and Fetter's opposition. The more developed record evidence satisfies the standard for granting Maersk's and 3MC's motions for summary judgment.[6] Contrary

---

[6] To the extent that Maersk purports to oppose 3MC's motion for summary judgment on grounds relating to the contract between Maersk and 3MC, (D.E. 118-2), the Court's disposition makes it unnecessary to reach that argument.

to Fetter's position that material issues of fact still exist, the Court finds he has not adduced competent evidence that could lead a reasonable jury to find that at the time of his injury, he was employed by any entity other than Maersk. Further, the record amply reflects that Fetter was not a Jones Act seaman. An appropriate order will be entered.

/s/ Katharine S. Hayden

Dated: January 27, 2019

Katharine S. Hayden, U.S.D.J.